# LEE LITIGATION GROUP, PLLC
30 EAST 39TH STREET, SECOND FLOOR
NEW YORK, NY 10016
TEL: 212-465-1180
FAX: 212-465-1181
INFO@LEELITIGATION.COM

WRITER'S DIRECT:    212-465-1188
                    cklee@leelitigation.com

August 5, 2013

**VIA FAX (212)805-7991**
The Honorable J. Paul Oetken, U.S.D.J.
Southern District of New York
500 Pearl Street
New York, NY 10007

AUG 0 8 2013

                Re:   Jimenez, et al. v. KLB Foods, Inc., et al.    The Clerk of Court is Directed to:
                      Case No. 12-cv-6796                              ___ Term motion (doc. #___)
                                                                       ✓ Doc. and File As: letter

Dear Judge Oetken:

    We are counsel to Plaintiffs. We write to oppose Defendants' request to file a motion to dismiss, and to respectfully request leave to file a motion for sanctions against Defendants' counsel, for the reasons stated below.

Defendants' Motion to Dismiss the Complaint Due to Plaintiffs' Alleged Legal Status as Undocumented Workers

    Defendants' request to file a motion to dismiss the complaint based on Plaintiffs' alleged legal status is contrary to both the law of the Second Circuit and the Department of Labor's wage and hour enforcement policies. Undocumented workers are entitled to recover unpaid wages under the FLSA, despite the *Hoffman* and *Palma* decisions (which related to back pay under the National Labor Relations Act).

    The U.S. Department of Labor has addressed Defendants' exact argument in Fact Sheet #48: Application of U.S. Labor Laws to Immigrant Workers: Effect of *Hoffman Plastics* decision on laws enforced by the Wage and Hour Division (attached as **Exhibit A**), explaining: "The Department's Wage and Hour Division will continue to enforce the FLSA...without regard to whether an employee is documented or undocumented. Enforcement of these laws is distinguishable from ordering back pay under the NLRA...Under the FLSA...the Department (or an employee) seeks back pay for hours an employee has actually worked, under laws that require payment for such work." The *Hoffman Plastics* Court's "concern with awarding back pay for 'years of work not performed, for wages that could not lawfully have been earned' does not apply to work actually performed."

    The courts, including the Second Circuit, have followed the Department of Labor's approach. See *Liu v. Donna Karan International, Inc.*, 2002 WL 1300260 (S.D.N.Y. 2002); Flores, et al. v. Anjost Corp., et al. No. 11 Civ. 1531 (S.D.N.Y. Aug 2, 2013) (the parties must submit a revised notice stating "...you have the right to

participate in this action even if you are an undocumented immigrant or if you were paid in cash."), citing *Kemper v. Westbury Operating Corp.*, No. 12 Civ. 895, 2012 WL 4976122, at *6 (E.D.N.Y. Oct. 17, 2012); *See also Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299 (11th Cir. 2013) (undocumented aliens may recover their unpaid wages under the FLSA); *Flores v. Albertson's, Inc.*, 2002 WL 1163623 (C.D. Cal. 2002). In *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219 (2d. Cir. 2006) the Second Circuit explained:

> [A]n order requiring an employer to pay his undocumented workers the minimum wages prescribed by the [FLSA] for labor actually and already performed...does not....condone that violation or continue it. It merely ensures that the employer does not take advantage of the violation by availing himself of the benefit of undocumented workers' past labor without paying for it in accordance with minimum FLSA standards. *Id*.

The Secretary of Labor recently stated in Appellee's Amicus Brief in *Lucas, et al v. Jerusalem Café, LLC, et al.*, No. 12-2170 (8th Cir. July 29, 2013), "the only circuit court to address the question directly, *see Patel v. Quality Inn S.*, 846 F.2d 700 (11th Cir. 1988); numerous district courts...and the Secretary of Labor all agree: employers who unlawfully hire unauthorized aliens must otherwise comply with federal employment laws." *Id* at 7.

Thus, Defendants' request to file a motion to dismiss must be denied.

<u>Defendants' Motion to Dismiss the Complaint as Against Kunwar Bist</u>

While Defendants seek leave to file a "motion to dismiss" against individual defendant Kunwar Bist, what they are actually seeking is a motion for summary judgment, as the issue of whether a defendant is an employer under the Fair Labor Standards Act ("FLSA") is a factual issue. Under the 'economic reality' test, the relevant factors include whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment and (4) maintained employment records. No one factor is dispositive but the economic reality test encompasses the totality of the circumstances.

Defendants' counsel's blanket denial of Mr. Bist's employer status is not enough to award summary judgment (or dismissal). In fact, Defendant Bist testified in his deposition to the following:

1. He had the power to hire employees (Bist Dep. Tr.[1] at 14-15);
2. He had the power to fire employees (Bist Dep. Tr at 14, 16-17);
3. He personally pays the employees (Bist Dep. Tr. at 22);
4. He maintains employment records, work schedules (Bist Dep. Tr. at 27:18-23), payment slips and attendance register (Bist Dep. Tr. 34-35);

---

[1] Referenced pages of the Deposition Transcript of Kunwar Bist are attached hereto as **Exhibit B**.

5.  As the owner, he is in charge of wage and hour compliance (Bist Dep. Tr. at 32-33).

Further, Ranu Rawat testified in his Deposition that he and Mr. Bist had the power to hire and fire employees, determine salaries, set employee's work schedules and maintain the employee records (Rawat Dep. Tr.[2] at 8:18-10:4).

For the reasons stated above, Defendants' request must be denied.

Plaintiffs' Motion for Sanctions

Fed. R. Civ. P. 11(b) provides in relevant part:

By presenting to the court ... a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the claims, defenses, and other legal contentions therein are warranted by existing law ... [and that] the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. Fed. R. Civ. P. 11(b). If, after notice and a reasonable opportunity to respond, the court determines that the standards set forth in section (b) have been violated, the court may impose sanctions upon the attorneys, law firms, or parties. See Fed. R. Civ. P 11(c), FN 26.

A pleading, motion or other paper violates Rule 11 either when it " 'has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law....' " *W.K. Webster & Co. v. American President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir. 1994) (quoting *Eastway*, 762 F.2d at 254).

In the instant action, Plaintiff requests that the Court impose sanctions on Defendants' counsel as he failed to conduct reasonable inquiry into the law before filing his pre-motion request. Had he done so, he would have determined that such request would be denied. Further, after receipt of Defendants' pre-motion conference letter, we wrote to Defendants' counsel, provided him with the relevant law and the opportunity to withdraw his request, and advised that if his request was not withdrawn, we intended to seek sanctions (see **Exhibit D**). Defendants refused to withdraw their request. As such, we respectfully request a pre-motion conference and for leave to file a motion for sanctions.

Respectfully,

/s/ *C.K. Lee, Esq.*

cc: All parties via Email

---

[2] Referenced pages of Rawat Deposition Transcript are attached hereto as **Exhibit C**.

U.S. Department of Labor
Wage and Hour Division

**WHD**
U.S. Wage and Hour Division
(Revised July 2008)

# Fact Sheet #48: Application of U.S. Labor Laws to Immigrant Workers: Effect of Hoffman Plastics decision on laws enforced by the Wage and Hour Division

On March 27, 2002, the U.S. Supreme Court ruled in **Hoffman Plastic Compounds, Inc. v. NLRB**, No. 00-1595 (S. Ct.), that the National Labor Relations Board (NLRB) lacked authority to order back pay to an undocumented worker who was laid off from his job because of union activities.

In **Hoffman Plastics**, the Supreme Court decided that providing back pay to the undocumented worker would conflict with policies under U.S. immigration laws. Those laws require employees to present documents establishing their identity and authorization to work at the time they are hired. An employer must check those documents and cannot knowingly hire someone who is not authorized to work. In **Hoffman Plastics**, the employee presented false documentation when he was hired. He was later laid off for trying to organize a union, in violation of the National Labor Relations Act (NLRA). The NLRB sought back pay for a period of time after the layoff. The Supreme Court concluded that back pay should not be awarded "for years of work not performed, for wages that could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud."

The Supreme Court's decision does not mean that undocumented workers do not have rights under other U.S. labor laws. In **Hoffman Plastics**, the Supreme Court interpreted only one law, the NLRA. The Department of Labor does not enforce that law. The Supreme Court did not address laws the Department of Labor enforces, such as the Fair Labor Standards Act (FLSA) and the Migrant and Seasonal Agricultural Worker Protection Act (MSPA), that provide core labor protections for vulnerable workers. The FLSA requires employers to pay covered employees a <u>minimum wage</u> and, in general, time and a half an employee's regular rate of pay for <u>overtime hours</u>. The MSPA requires employers and farm labor contractors to pay the wages owed to migrant or seasonal agricultural workers when the payments are due.

The Department's Wage and Hour Division will continue to enforce the FLSA and MSPA without regard to whether an employee is documented or undocumented. Enforcement of these laws is distinguishable from ordering back pay under the NLRA. In **Hoffman Plastics**, the NLRB sought back pay for time an employee would have worked if he had not been illegally discharged, under a law that permitted but did not require back pay as a remedy. Under the FLSA or MSPA, the Department (or an employee) seeks back pay for hours an employee has **actually worked**, under laws that require payment for such work. The Supreme Court's concern with awarding back pay "for years of work not performed, for wages that could not lawfully have been earned," does not apply to work actually performed. Two federal courts already have adopted this approach. See **Flores v. Albertson's, Inc.**, 2002 WL 1163623 (C.D. Cal. 2002); **Liu v. Donna Karan International, Inc.**, 2002 WL 1300260 (S.D.N.Y. 2002).

The Department of Labor is still considering the effect of **Hoffman Plastics** on other labor laws it enforces, including those laws prohibiting retaliation for engaging in protected conduct.

### Where to Obtain Additional Information

For additional information, visit our Wage and Hour Division Website: <u>http://www.wagehour.dol.gov</u> and/or call our toll-free information and helpline, available 8 a.m. to 5 p.m. in your time zone, 1-866-4USWAGE (1-866-487-9243). Information about the <u>FLSA</u> and <u>MSPA</u> is also available on the Internet.

EXHIBIT A

### Page 14

KUNWAR BIST

2  A. Yes, we can discuss it on the phone
3  also.
4  Q. And then you would make a
5  consolidated decision?
6  A. Yes.
7  Q. How about hiring and firing
8  employees, can you hire somebody on your own?
9  A. Yes, Ranu and I will make a joint
10 decision to hire someone.
11 Q. You and Ranu can hire somebody?
12 A. Yes.
13 Q. What if Ranu is not around, can you
14 hire somebody?
15 A. It depends on how bad the need is.
16 Q. So you could if you wanted to if
17 Ranu is not around?
18 A. Yes, but I will discuss it with him
19 on the phone that I'm making this decision.
20 Q. If you can't catch him on the
21 phone, can you make the decision yourself?
22        MR. CHAUBEY: Mr. Lee, you're asking
23        all the questions. I'm just objecting not
24        --
25 A. If I don't get him on the phone one

### Page 15

KUNWAR BIST

2  day, I can wait until I get him on the phone the
3  next day and ask him.
4  Q. Let's say you saw an employee --
5        MR. CHAUBEY: I'm going to object to
6        this line of questioning. If you want to
7        do anything because these are not even the
8        part of your complaint. It is beyond
9        scope of -- you are asking a hypothetical
10       question when my client has already
11       answered that he has to make a decision
12       with his client --
13       MR. LEE: Stop. Stop with your
14       running objections. All you have to say
15       is you object, and you sit in the corner
16       and you stop talking because it's my
17       deposition.
18       MR. CHAUBEY: I know but I'm objecting
19       to the form.
20       MR. LEE: That's all you have to say.
21       That's all you have to say.
22       MR. CHAUBEY: You are leading.
23       MR. LEE: Shut up. That's all you
24       have to say.
25       MR. CHAUBEY: You're leading.

### Page 16

KUNWAR BIST

2        MR. LEE: I'm not leading. I'm
3        talking, and I can lead if I want.
4        MR. CHAUBEY: No.
5        MR. LEE: So sit on the side and stop
6        talking.
7        MR. CHAUBEY: But I will --
8        MR. LEE: Stop talking.
9        MR. CHAUBEY: You can do anything, but
10       you cannot ask a hypothetical question.
11       MR. LEE: Of course I can.
12       MR. CHAUBEY: It is on record. You
13       can move forward. Over my objection these
14       hypothetical questions.
15 Q. Have you ever fired employees?
16 A. No, mostly people leave on their
17 own.
18 Q. You have never terminated an
19 employee?
20 A. No.
21 Q. If you wanted, can you fire an
22 employee?
23 A. I have to find out what the mistake
24 was and what the grounds were and talk to people
25 about it.

### Page 17

KUNWAR BIST

2  Q. If there were grounds for
3  termination, can you terminate an employee?
4  A. I could speak with them to do it.
5  Q. But let's say somebody was
6  performing really poorly, can you fire them?
7  A. I would try to make him understand
8  or make him understand how to do things better.
9  Q. What if they don't improve?
10       MR. CHAUBEY: These are all
11       hypothetical questions. Over my
12       objection.
13 Q. What if they don't improve?
14 A. I will tell him if you can't
15 improve, you can leave.
16 Q. If an employee comes to you and
17 says, "Oh, can I change my schedule from Friday
18 to Saturday," can you accommodate him?
19 A. I would suggest that the person
20 you're working with, your partner, you can
21 mutually come to agreement, and that can be
22 arranged.
23 Q. If somebody asked if they could
24 take a couple of days off because they had a
25 death in the family, can you make a decision to

5 (Pages 14 to 17)

EXHIBIT B

**Page 18**

KUNWAR BIST

accommodate?
  A. Yes, of course.
  Q. If somebody asked you if they could work more hours because they needed the extra work to earn more money, can you make the decisions to accommodate?
  A. No, I would rather hire an additional person rather than give one person more hours.
  Q. Do you own any other businesses other than Andaz Restaurant?
  A. No.
  Q. Is Andaz Restaurant the only source of your income?
  A. That's it, only Andaz.
  Q. Are you married?
  A. Yes.
  Q. Does your wife work also?
  A. No.
  Q. So you're the sole breadwinner of the family?
  A. Yes.
    MR. LEE: Mark this, please.
    (Bist Exhibit 1 was marked on the

**Page 19**

KUNWAR BIST

record.)
  Q. I'm showing the witness what's marked as Bist Exhibit 1.
  A. Yes.
    THE INTERPRETER: He needs to get his glasses.
    MR. CHAUBEY: I told him that he should take his glasses to review the documents. You can take a moment to review the documents, and Mr. Lee will ask questions based on your review.
    MR. LEE: Off the record.
    (An off the record discussion was held at this time.)
  Q. What's marked as Bist Exhibit 1 is a tax return form for the year 2010 for KLB Foods, Inc.; is that correct?
  A. Correct.
  Q. Is that the first year that KLB Foods, Inc. filed tax returns?
  A. Yes.
  Q. So it has its gross revenues as $606,000; is that correct?
  A. Yes, I provided these numbers.

**Page 20**

KUNWAR BIST

  Q. Is there any reason to think that the information in the tax returns would be incorrect?
  A. No.
    MR. LEE: Mark these.
    (Bist Exhibit 2 and 3 were marked on the record.)
  Q. I'm showing the witness what's marked as Bist Exhibit 2 and Bist Exhibit 3 which are tax returns for the years 2011 and 2012 respectively. I'm pointing out to the gross revenues numbers for 2011.
    Under Bist 2 it says, "$688,000."
    Is there any reason that number is incorrect?
  A. Yes, my accountant provided it.
  Q. And you think the number is correct, right?
  A. I'll have to double check, but this is the numbers that are in here. That's correct.
  Q. And the same with 2012, right, based on your understanding, the gross revenues for 2012 is $719,000 and you think this number

**Page 21**

KUNWAR BIST

is correct also, right?
  A. I provided the accountant with the numbers, but I don't remember the numbers now, but he's the one who made these documents so I believe it's correct.
  Q. Great. Thank you.
    When you hire a new employee, what kind of forms do you have them fill out?
  A. I-9.
  Q. What else?
  A. And we ask for the Social Security number.
  Q. Anything else?
  A. No.
    MR. LEE: Mark this.
    (Bist Exhibit 4 and 5 were marked on the record.)
  Q. I'm showing the witness what's marked as Plaintiff's Exhibit 4, Bist Exhibit 4. I just wanted to make the record clear, Bist Exhibit 4 is a six-page document that's also paginated P1 through P6.
    MR. CHAUBEY: P7, P8 you are not showing at this time?

Page 22

```
 1              KUNWAR BIST
 2        MR. LEE: That's right.
 3        MR. CHAUBEY: No, because I --
 4        MR. LEE: Yeah.
 5   Q.   Can you tell me what the document
 6   on the first page is?
 7   A.   It's a delivery order.
 8   Q.   Great. Thank you.
 9        How come there's no line item or
10   tip on the delivery order?
11   A.   The credit card slip which
12   accompanies this has the line item for tips.
13   Q.   Now, I'm showing the witness pages
14   P4 and P6.
15        Can you tell me what these
16   documents are? They're photocopies of little
17   slips of paper with handwriting on it. I'm
18   going to give you an example. This is what the
19   original looks like.
20   A.   It's okay, yes.
21   Q.   Do you know what these are?
22   A.   Yes, the weekly salaries that I
23   give, that's originally here.
24   Q.   So you write the amount that you
25   pay on a slip of paper, and you give it to the
```

Page 23

```
 1              KUNWAR BIST
 2   employees along with a cash payment; is that
 3   right?
 4   A.   Yes, because these people have not
 5   -- did not fill out the I-9 forms. That is why
 6   I had to give these people cash.
 7   Q.   At least for the people listed on
 8   P4 and P6, it would be I guess Baltazar, you
 9   gave them a cash payment of $105, right?
10   A.   Yes, that's the salary agreement.
11   Q.   Is that a weekly salary for
12   Baltazar?
13   A.   Yes.
14   Q.   For this person Jose on P6, you
15   also I guess give him $105 weekly?
16   A.   Yes.
17   Q.   I'm showing the witness what's
18   marked as Bist 5, a two-page document also
19   marked also P7 and P8 as pagination numbers.
20   A.   Yes.
21   Q.   On Bist Exhibit 5 there's a
22   photocopy of I guess another delivery slip; is
23   that right, on the left-hand corner?
24   A.   Yes.
25   Q.   And also photocopied are I guess
```

Page 24

```
 1              KUNWAR BIST
 2   weekly cash payments made to a person named
 3   Jose; is that right?
 4   A.   Yes, correct.
 5   Q.   And they generally say about $105
 6   per week; is that right?
 7   A.   Sometimes it's less. Sometimes
 8   it's $85 when he's working for less hours, yeah.
 9   Q.   But when he's working his full
10   schedule, he gets $105?
11   A.   Yes.
12        MR. LEE: Mark this, please.
13        (Bist Exhibit 6 was marked on the
14        record.)
15   Q.   I'm showing the witness what's
16   marked as Exhibit 6. They are also Bates
17   stamped D1 through D86. It wasn't Bates stamped
18   when I got it, but I went ahead and did it so I
19   could keep track.
20        Can you go ahead and look at this?
21   A.   Yes.
22   Q.   There's a set of documents from D1
23   through D32.
24        Can you tell me what these
25   documents are?
```

Page 25

```
 1              KUNWAR BIST
 2   A.   These people on pages 1 to 32 are
 3   people who worked on an hourly basis. These
 4   people used to come in the evenings and work for
 5   two and a half hours every day, sometimes six
 6   days.
 7   Q.   So let me ask the questions one at
 8   a time.
 9        Is this your handwriting from D1
10   through D32?
11   A.   No, it's not mine.
12   Q.   Who handwrote this?
13   A.   Ranu.
14   Q.   But you're familiar with this
15   document also, right?
16   A.   Yes, this is a salary slip. You
17   see, the signature slips are here.
18   Q.   Do you mark in the Ps and the As on
19   this form?
20        MR. CHAUBEY: Mr. Lee, he has already
21        said he doesn't write it, so if you're
22        asking this question --
23        MR. LEE: I'm just asking him to
24        clarify.
25   Q.   Do you fill out the Ps and the As?
```

7 (Pages 22 to 25)

Page 26

KUNWAR BIST

1  A. No, not mine.
2  Q. Who does that?
3  A. Ranu did it.
4  Q. Ranu Rawat?
5  A. Yes.
6  Q. Can you tell me what the Ps mean?
7  A. Present.
8  Q. And A means absent?
9  A. Yes.
10 Q. If there are certain blanks, does that mean they are not scheduled for the blank shift?
11 A. They did not come those days.
12 Q. So each person was an afternoon and an evening shift; is that right?
13 A. Yes, correct.
14 Q. Can you tell me what the shift hours are?
15 A. Morning 11:00 a.m. to 3:00 p.m. and 5:00 to 10:30 p.m. In winter it's still 10:30 p.m. and in summer we close at 11:00, don't take any orders after 11:00.
16 Q. When you say summer, when does the summer schedule start?

Page 27

KUNWAR BIST

1
2  A. From May to August.
3  Q. Do employees work between 3:00 to 5:00 p.m.?
4  A. No, the restaurant is closed at that time.
5  Q. But do they work even though the restaurant is closed?
6  A. No, nobody works.
7  Q. Not even kitchen workers?
8  A. Not even.
9     MR. LEE: Mr. Chaubey just spoke something in Hindi to his witness, and it's improper for him to be doing that while we're on the record.
10    MR. CHAUBEY: I'm sorry, but I did say Hindi. That is true.
11 Q. So other than the time schedules that you have provided on D1 through D32, are there other work schedules that show the hours worked of the employees? Because these actually don't show the actual hours worked.
12 A. Yes, I have it.
13 Q. Where are they, how come I don't have them?

Page 28

KUNWAR BIST

1     MR. CHAUBEY: Let him explain.
2  A. Regular staff when they get the salary, they get a slip and the hours and details.
3  Q. For the plaintiffs in this case, how come you haven't provided that?
4  A. Because they did not fill out the I-9 form, and they did not give me the filled I-9 form.
5  Q. So for the plaintiffs on this case you don't have these forms but you're saying you have them for other employees; is that right?
6  A. Yes, that's correct.
7  Q. Do you know what the claims are against you on this case?
8  A. Yes, I do know.
9  Q. What are the claims?
10 A. They have claimed that they worked longer hours.
11 Q. Do you know the names of the plaintiffs on this case?
12 A. Yes.
13 Q. Tell me who they are.
14 A. One is Jose.

Page 29

KUNWAR BIST

1  Q. Do you know his last name?
2  A. I don't know his last name.
3  Q. Who else?
4  A. Carrasco.
5  Q. Well, Carrasco is his last name. Do you know his first name?
6  A. I don't know his first name.
7  Q. Who else?
8  A. Baltazar.
9  Q. Do you know the last name?
10 A. No, I don't.
11 Q. Anybody else?
12 A. No one else.
13 Q. How about Candido Merino?
14 A. I don't know what Candido has said. I don't know about him.
15 Q. Do you know that he's part of the lawsuit also?
16 A. Recently I found out.
17 Q. What are their claims against you?
18 A. They are lying, and they told me that they worked more hours.
19 Q. You said the afternoon shift is 11:00 to 3:00; is that right?

8 (Pages 26 to 29)

Page 30

KUNWAR BIST

2  A. Yes.
3  Q. Do employees actually get in before
4  11:00?
5  A. No.
6  Q. And the schedule that you
7  mentioned, is it for every day of the week or is
8  it something different?
9  A. It keeps changing. Our holidays
10 keep changing.
11 Q. But generally it's the hours that
12 you said earlier?
13 A. Yes.
14 Q. I'm sorry, can you verbalize what
15 the specific claims are for the plaintiffs on
16 this case?
17       MR. CHAUBEY: If you know.
18 Q. If you know.
19 A. I do know, yes.
20 Q. What are Jose's Jimenez's claims?
21 A. Jose had said that he has worked
22 more hours.
23 Q. What else?
24 A. And he also said that he has worked
25 in the kitchen whereas they don't know how to

Page 31

KUNWAR BIST

2  prepare Indian food.
3  Q. Let me be a little bit more
4  specific.
5       In the first amended complaint on
6  this case, Mr. Jimenez stated that he worked
7  from 4:30 to 11:00 seven days a week; is that
8  true?
9  A. It's incorrect.
10 Q. What was his working schedule?
11 A. The three or four people in that
12 time slot of deliveries, one who was working
13 from 5:00 to 7:30, then 6:00 to 8:30 and another
14 guy 8:30 to 11:00.
15 Q. So what was Jose Jimenez's
16 schedule?
17 A. They used to keep changing between
18 themselves every week.
19 Q. You're saying the three delivery
20 guys?
21 A. Sometimes there were also four
22 delivery people, and in that case they used to
23 work six days a week.
24 Q. You're saying he only worked two
25 and a half hours per day?

Page 32

KUNWAR BIST

2  A. Yes. When they came they were told
3  that they will be working two and a half hours
4  per day, and it was a fixed salary for those two
5  and a half hours.
6  Q. What was the hourly rate?
7  A. $5.65, something like that plus
8  tips.
9  Q. Jose said that he started working
10 for you in August 2011; is that true?
11 A. I don't remember the exact date.
12 Q. Are you in charge of, as the owner,
13 do you try to comply with wage and hour laws?
14 A. Yes, that is why people who work
15 with tips it's $5.65 an hour.
16 Q. What have you done to ensure that
17 your employees are paid properly?
18 A. If I don't give them a salary, they
19 won't work for me.
20 Q. Have you investigated how to comply
21 with state and federal employment laws?
22 A. I was paying them the salaries
23 according to those laws.
24 Q. Did you read the law yourself or
25 did you investigate with an advisor?

Page 33

KUNWAR BIST

2  A. Yes, whatever the CPA advised, I
3  did that.
4  Q. You're saying your CPA advised you
5  on how to comply with state and federal wage and
6  hour laws?
7  A. Yes, he is the one who reads and
8  understands it and prescribes the salary.
9  Q. To you?
10 A. Yes.
11 Q. Who is your CPA?
12 A. I have to think of his name. Wait
13 a second -- Mr. Raman.
14 Q. What's his first name?
15 A. This is his first name.
16 Q. What's his last name?
17 A. We know him by just this name.
18       MR. LEE: Can you agree to provide his
19 contact details?
20       MR. CHAUBEY: Maybe see in the tax
21 return if it will be there.
22       MR. LEE: The tax return says RG
23 Bookkeeping and Tax Service Inc.
24 Q. Is that your CPA?
25 A. That is it.

9 (Pages 30 to 33)

Page 34

KUNWAR BIST

Q. But I need his last name in order to subpoena him.
A. I have provided you with the documents.
MR. LEE: Can you agree to provide his full name?
MR. CHAUBEY: I will provide his full name. That is not a big deal.
Q. Is Mr. Jimenez still employed by you?
A. No.
Q. When did he stop working for you?
A. I don't remember the exact date.
Q. Do you have a record of when he left?
A. Yes, I have slips like this, and it's written on the slips when he left work and the attendance register.
Q. Can you show me on the attendance register when he stopped working for you?
A. I don't have it with me here now.
MR. LEE: Mr. Chaubey, can you agree that he'll supplement his attendance records to show when Mr. Jose Jimenez was

Page 35

KUNWAR BIST

hired and when he was terminated?
MR. CHAUBEY: Yes, I will.
Q. For Vicente Carrasco, did he start working for you in January 2012?
A. I don't remember the exact dates, but he has worked with me.
MR. LEE: Just to kind of speed things along, Mr. Chaubey, can you agree to provide the attendance records for all the four plaintiffs, Jimenez, Carrasco, Sanchez and Merino? I don't think the witness will remember.
MR. CHAUBEY: I will.
MR. LEE: Mr. Chaubey has agreed that he will provide attendance records that reflect the hire and fire dates.
MR. CHAUBEY: Definitely.
Q. So you believe you have them; is that right?
A. Yes, I kept them.
MR. CHAUBEY: He's saying, is that something like this which you are mentioning?
THE WITNESS: Something like this,

Page 36

KUNWAR BIST

yes.
MR. LEE: The witness is pointing to what's marked as Exhibit 6. He would have a schedule that would show similar to what is in Exhibit 6, a schedule showing when the plaintiffs started work and ended work.
Q. Vicente Carrasco, he was paid a fixed weekly salary $105 per week; is that right?
A. That's correct.
Q. Was his working schedule 4:30 to 11:00 for seven days a week?
A. No, the restaurant opens at 5:00, and they all have two and a half hour shifts each.
Q. Were all the plaintiffs delivery guys?
A. Yes.
Q. All four plaintiffs were delivery people, right?
A. Three.
Q. Jimenez was delivery, Carrasco was delivery.

Page 37

KUNWAR BIST

How about Sanchez, was he delivery?
A. Candido was a dishwasher prior, and then he started delivery.
Q. So what about Baltazar Sanchez, was he working two and a half hours per day?
A. Yes.
Q. How many days a week did he work?
A. Sometimes five days, sometimes six days, sometimes seven days.
Q. Is that the same for Vicente Carrasco?
A. Correct, same.
Q. And the same for Jose Jimenez, correct?
A. That's correct.
Q. Based on your records, right?
A. Correct.
Q. How about Candido, his working schedule?
A. Candido was later on doing delivery also. It was the same kind of schedule.
Q. Was he paid $105 also?
A. Yes, if he was working seven days, he would get $105. It would be less if it was

### Page 6

```
 1          RANU RAWAT
 2     IFFAT HUSSAIN, called as the
 3   interpreter in this matter, was duly sworn by
 4   a Notary Public of the State of New York to
 5   accurately and faithfully translate the
 6   questions propounded to the witness from
 7   English into Hindi and the answers given by
 8   the witness from Hindi into English.
 9
10     RANU RAWAT called as a witness,
11   having been first duly sworn by Ashley Cohen,
12   a Notary Public within and for the State of
13   New York, was examined and testified as
14   follows:
15   EXAMINATION BY
16   MR. LEE:
17     Q.   State your name for the record,
18   please.
19     A.   Ranu Rawat.
20     Q.   Good afternoon. My name is C.K.
21   Lee. I'm counsel to the plaintiffs.
22         Do you speak English?
23     A.   Somewhat, yes.
24     Q.   If you can understand me and you
25   want to respond in English and just use a
```

### Page 7

```
 1          RANU RAWAT
 2   translator if you need help, we can do it that
 3   way. It's up to you.
 4     A.   I would rather go through the
 5   translator.
 6     Q.   I just want to confirm your full
 7   legal name is R-A-N-U R-A-W-A-T?
 8     A.   That's correct.
 9     Q.   Do you go by any other names?
10     A.   No.
11     Q.   Is Ranu short for something?
12     A.   This is the full name.
13     Q.   What is your current address?
14     A.   2358 38th Street, Apartment 1R,
15   Astoria, New York 11105.
16     Q.   Are you familiar with a restaurant
17   called Andaz?
18     A.   Yes, I work there.
19     Q.   What's the location of the
20   restaurant?
21     A.   1378 First Avenue New York, New
22   York 10021.
23     Q.   And the restaurant has been there
24   for how long?
25     A.   Its been running for four years.
```

### Page 8

```
 1          RANU RAWAT
 2     Q.   The restaurant is operated by a
 3   company called KLB Foods; is that right?
 4     A.   Correct.
 5     Q.   And you're a shareholder in KLB
 6   Foods I think, right?
 7     A.   Correct.
 8     Q.   And the other shareholders are
 9   Aditya Patwal, Hari Singh, and Kunwar Bist?
10     A.   That's correct.
11     Q.   Mr. Bist I think is a 49 percent
12   share holder; is that right?
13     A.   That's correct.
14     Q.   And the other two people including
15   yourself are each 17 percent shareholders; is
16   that right?
17     A.   That's correct.
18     Q.   You and Mr. Bist, you're in charge
19   of operating the restaurant; is that right?
20     A.   Yes.
21     Q.   You and Mr. Bist can hire and fire
22   employees; is that right?
23     A.   Mostly but we are partnership so we
24   keep them in the decisions.
25     Q.   The other partners who are not
```

### Page 9

```
 1          RANU RAWAT
 2   working day to day; is that right?
 3     A.   That's correct.
 4     Q.   They also participate in the
 5   decision making for who to hire and who to fire?
 6     A.   Yes, we work together.
 7     Q.   And also for the determining
 8   salaries, can you and Mr. Bist make the
 9   decisions as to determining salaries for
10   employees?
11     A.   We work together, but we also ask
12   our CPA for recommendations and to see if we're
13   doing the right thing.
14     Q.   When you say we, is that you and
15   Mr. Bist or you and all the other shareholders?
16     A.   All four of us.
17     Q.   In regards to employees' work
18   schedules, do you and Mr. Bist make the
19   decisions or do you and Mr. Bist and all the
20   other shareholders make the decisions
21   collectively?
22     A.   Mostly because the two of us are
23   onsite, mostly it's between the two of us for
24   work schedules.
25     Q.   And you and Mr. Bist maintain the
```

3 (Pages 6 to 9)

TransPerfect Legal Solutions
212-400-8845 - Depo@TransPerfect.com

EXHIBIT C

|  | Page 10 |  | Page 12 |
|---|---|---|---|
| 1 | RANU RAWAT | 1 | RANU RAWAT |
| 2 | employee records onsite? | 2 | attorney knows, Mr. Chaubey. |
| 3 | A. Correct. Whatever it is, we do | 3 | Q. What have you and Mr. Bist done to |
| 4 | keep it. | 4 | make sure that you have complied with employment |
| 5 | Q. You work full time at the | 5 | laws? |
| 6 | restaurant; is that right? | 6 | A. We know that we're working |
| 7 | A. That's correct, five days a week. | 7 | according to guidelines by the law because we |
| 8 | Q. Does Mr. Bist also work full time? | 8 | have been advised to believe correctly by our |
| 9 | A. When I'm not there he works full | 9 | CPA for the meaning of full-time employee and |
| 10 | time, but if I'm there he works -- he comes for | 10 | what's the meaning of a part-time employee. |
| 11 | three or four hours. | 11 | Q. Do you know who Hyatt is? |
| 12 | Q. Per day? | 12 | A. It's a female who was our employee. |
| 13 | A. It depends on when he can come. | 13 | Q. Do you know Hyatt's last name? |
| 14 | Q. So the two days when you're not | 14 | A. I don't remember at this moment. |
| 15 | there, he's there the full two days? | 15 | Q. Do you know a person named Ahmad? |
| 16 | A. Three days. | 16 | A. Yes. |
| 17 | Q. I thought you said you worked there | 17 | Q. What is his last name? |
| 18 | five days? | 18 | A. Ahsan. |
| 19 | A. Yes. | 19 | Q. Do you know a person named Sohail? |
| 20 | Q. So that's two days a week you're | 20 | A. Yes, he still works with us. This |
| 21 | not there; is that right? | 21 | is his nickname. His other name is Nurul. |
| 22 | A. Correct. | 22 | Q. Do you know the names of the |
| 23 | Q. So the two days you're not there, | 23 | plaintiffs on this case? |
| 24 | Mr. Bist is there the full days; is that right? | 24 | A. Yes. |
| 25 | A. There is no such rules, but he | 25 | Q. Can you give me their names? |

|  | Page 11 |  | Page 13 |
|---|---|---|---|
| 1 | RANU RAWAT | 1 | RANU RAWAT |
| 2 | tried his best to remain to be there. | 2 | A. One is Jose, Carrasco. |
| 3 | Q. For the full day? | 3 | Q. It's Vicente Carrasco? |
| 4 | A. Correct. | 4 | A. Correct. |
| 5 | Q. How many hours are you working | 5 | Q. And Jose Jimenez, right? |
| 6 | there when you're working a full day? | 6 | A. Yes. |
| 7 | A. First I work 12:00 to 3:00 and then | 7 | Q. And Baltazar Sanchez? |
| 8 | 5:00 to 9:30. | 8 | A. That's correct. |
| 9 | Q. So your working hours are 12:00 to | 9 | Q. And Candido Merino? |
| 10 | 3:00 and 5:00 to 9:30? | 10 | A. Yes, correct. |
| 11 | A. Correct, from 12:00 to 3:00 and | 11 | Q. They were all delivery guys except |
| 12 | 5:00 to 9:30. | 12 | Candido was a dishwasher at that point? |
| 13 | Q. Other than your business | 13 | A. Yes, Candido started as a |
| 14 | relationship, do you have any other relationship | 14 | dishwasher, and then he became a delivery |
| 15 | with Mr. Bist? | 15 | person. |
| 16 | A. No. | 16 | Q. So when an employee is hired, what |
| 17 | Q. You're not related by marriage or | 17 | forms do you give them to fill out? |
| 18 | by blood? | 18 | A. We try to get an I-9 form filled |
| 19 | A. No. | 19 | out and given back to us. |
| 20 | Q. Are you aware of the claims of the | 20 | Q. Anything else? |
| 21 | plaintiffs against the restaurant? | 21 | A. Nothing else. |
| 22 | A. Yes, we know that they filed a | 22 | Q. Do you ask employees that you hire |
| 23 | lawsuit. | 23 | to sign any other forms other than the I-9 form? |
| 24 | Q. Do you know what the claims are? | 24 | A. No. |
| 25 | A. Some I know, and the rest my | 25 | Q. Even now you only ask for an I-9 |

workspace webmail :: Print                    https://email14.secureserver.net/view_print_multi.php?uidArray=1795..

Print | Close Window

Subject: Jimenez v. KLB Foods Inc., et al.
From: anne@leelitigation.com
Date: Fri, Aug 02, 2013 12:57 pm
To: "Sanjay Chaubey" <chaubeylaw@gmail.com>
Cc: cklee@leelitigation.com
Attach: Immigration status- 8 clr 7-29-13-1.pdf

Sanjay:

We write to provide you with the opportunity to withdraw your pre-motion letter dated August 1, 2013.

Your argument that the FLSA does not apply to undocumented aliens is nonsensical and is contrary to the law. See *Lucas v. Jerusalem Café, LLC*, No. 12-2170, attached. Further, as an attorney you should be fully aware that both the Second Circuit and the Department of Labor have repeatedly held that *Hoffman* is completely inapplicable to the FLSA and the enforcement of wage and hour laws.

Your argument that individual Defendant Bist is not the Plaintiffs' employer is clearly contradicted by the deposition testimony.

**Please be advised that if you do not withdraw your frivolous pre-motion letter by Monday August 5, 2013 at 10:00 A.M., we will prepare our response which will seek reimbursement for our legal fees, against your firm personally.**

Anne Seelig, Esq.
Lee Litigation Group, PLLC
30 East 39th St, Second Floor
New York, NY 10016
Email: anne@leelitigation.com
Direct: (212) 465-1124
Fax: (212) 465-1181

Copyright © 2003-2013. All rights reserved.

1 of 1                          EXHIBIT D                        8/6/2013 12:39 PM